## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

_____

| | |
|---|---|
| **THE UNITED STATES OF AMERICA, ex rel.** ) | |
| **STEPHEN BACHERT** ) | |
| ) | |
| Plaintiff, ) | 1:16-cv-456 |
| ) | |
| v. ) | |
| ) | |
| **TRIPLE CANOPY, Inc.** ) | |
| ) | |
| Defendant. ) | |

_____ )

### AMENDED COMPLAINT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from the false claims made by Triple Canopy, Inc. ("Triple Canopy"), in violation of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.* as amended.  In addition, Relator also alleges retaliation, wrongful termination and a violation of Virginia public policy embodied in Virginia Code 18.2-178 which prohibits obtaining money by false pretenses.

2.      Defendant Triple Canopy has a multi-year, multi-million dollar high threat contract with the United States Department of State responsible for the Ambassador's protection detail and to provide security to State Department officials throughout Iraq, one of the most hostile and dangerous places in the world.  A critical component of Defendant's obligation concerns conducting missions for State Department personnel, the United States Ambassador and "VIP" personnel (such as government officials and military commanders) from the American Embassy in Baghdad into the "red zone" – other areas of Baghdad and surrounding Iraqi towns.  Triple Canopy movement teams provide security for these individuals while engaged in these Iraqi-based missions.  When engaged in these missions, reliance on Triple Canopy's preparation and protection cannot be underestimated.

3.      As part of these mission-based security obligations, Triple Canopy is tasked with recording and supplying inspected and properly functioning weaponry in accordance with each weapon's manufacturer's specification.  Whereas the specifications are different for every weapon, each mandates an annual inspection which requires the use of gauges and inspecting key areas of the weapons as per manufacture service manuals.  The importance of maintaining operational weaponry is self-evident, vital and potentially life-saving.  The contract also includes the management of a separate State Department armory using a different data base.  Triple Canopy is required to maintain round count data books on the machine guns and sniper rifles.

4.      Triple Canopy agreed to provide a service that met certain objective requirements, failed to provide that service, and continued to bill the United States Government with the knowledge that it was not providing its contractual obligations.  Rather than comply with its contractual obligations, Triple Canopy:

      a.   failed to provide weaponry inspections;

      b.   falsified inspection procedures;

      c.   falsified inspection/audit records; and

      d.   falsified inspection test results.

5.      By doing so, Defendant misled the State Department and accepted payment from the United States Government for services Triple Canopy did not perform and tried to hide its failures from disclosure.  The falsified records were created, *inter alia,* to avoid detection, to legitimize Triple Canopy's payment requests and to persuade the State Department that Triple Canopy had complied with certain contractual requirements.

6.      The cost of Triple Canopy's misconduct was not purely financial - its conduct repeatedly and continually placed numerous American lives at risk.  Even when informed of this

illegal and life-threatening misconduct, Triple Canopy refused to investigate or correct the situation.  Instead, Triple Canopy responded with punishment by removing Mr. Bachert from Baghdad and ultimately terminating his employment.

## SUMMARY OF DISCLOSURES BY RELATOR

**Disclosure 1**:  In December 2014 to supervisor Robert Zalewski concerning failure to inspect;

**Disclosure 2**:  On December 13, 2014 to Mr. Zalewski concerning fabricated inspections; and

**Disclosure 3**:  On March 12, 2015 to program manager Frank Laura concerning failure to inspect, fabricated inspections, submission of false data and lying to State Department inspectors.

7.      The False Claims Act (the "Act"), originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986.  Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Act.  Congress acted after finding that fraud in the federal programs and procurement is pervasive and that the Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

8.      The Act provides that for any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000.00 for each such claim, plus three times the amount of damages sustained by the Government, including attorneys' fees.  The Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery.  The complaint is to be filed under seal

(without service on the Defendant) to enable the Government (a) to conduct its own investigation without the Defendant's knowledge, and (b) to determine whether to join the action.

9.      Based on these provisions, Plaintiff/Relator, Stephen Bachert, seeks to recover damages and civil penalties arising from Defendant's misconduct.

10.     Stephen Bachert has direct and independent knowledge of the conduct that violated the False Claims Act because Relator is a former employee of Defendant and observed the conduct.  Relator is the original source for the disclosure of Defendant's misconduct.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

12.     There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. §3730(e).

13.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because all the defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in the Commonwealth of Virginia.

14.     Venue exists in the United States District Court for the Eastern District of Virginia pursuant to 31 U.S.C. § 3730(b) because Defendant can be found in, resides, and/or transacts or has transacted business in the Commonwealth of Virginia.

## PARTIES

15.     Relator Stephen Bachert is a former Triple Canopy employee.  Mr. Bachert is the original source of and has direct and independent knowledge of all publicly disclosed information upon which the allegations contained herein are based.

16.     At all times relevant to this action, Defendant Triple Canopy, Inc. has been an Illinois corporation with its principal place of business located at 12018 Sunrise Valley Drive, #140, Reston, Virginia 20191.  Triple Canopy held itself out to the United States as being "[b]uilt on a foundation of legal, moral and ethical values" and "committed to the highest standards of accountability, compliance and quality."

17.     Upon information and belief, Triple Canopy was founded in May 2003.  In April 2009, contracts in Iraq handled by Blackwater USA, then under investigation for rule-breaking, were assigned by the State Department to Triple Canopy.  In June 2014 the firm merged with rival security contracting firm, Academi (formerly known as Blackwater USA), forming a new company – Constellis Group.  According to its website, Triple Canopy is a Constellis Group affiliated company.

18.     In 2014, Constellis Group and its affiliate companies were acquired by Constellis Holdings.

19.     At all times relevant herein, officers and employees of Defendant, acting within the scope of their duties and employment as agents of Defendant, directed Defendant's unlawful and fraudulent activities as described in this complaint.  At all times, Triple Canopy was aware of, ratified and confirmed the actions of its employees, agents and/or representatives, each of whom were acting within the scope of his/her respective employment.  Defendant benefitted financially from the unlawful and fraudulent activities described in the Complaint.

## FACTUAL BACKGROUND

20.     Mr. Bachert has seventeen (17) years of total armory experience, with more than ten (10) years of successful armory management and technical experience with significant knowledge of numerous weapon systems.

21.     Mr. Bachert served in the United States Department of the Army from 1997-2000. While in the Army, he attended the unit armorer's school, and serviced m2 machine guns, m-16 rifles, m4 rifles, m9 pistols, m203 grenade launchers, mk19 grenade launcher, m249 machine guns, m240 bravo machine guns, and m60 machine guns.  He was also qualified on these weapon systems.

22.     After leaving the Army, Mr. Bachert worked as an Assistant Patrol Supervisor and Armory Manager/Firearms Instructor for the Hyattsville, Maryland City Police Department, serving as the department's primary firearms instructor and senior armorer.

23.     Currently, Mr. Bachert holds the following factory certifications: FNH 240, 249, Mk46, Mk48, P90, Scar, M2 (familiar with the GAU21), Colt M4, Remington 870,700, Glock, Sig P Series, LMT 203, Knights SR25, Smith & Wesson M&P, Beretta and Benelli.

24.     Relator joined Triple Canopy as an Armorer at the Baghdad embassy in early 2014.  By January 2015, Relator was classified as a Senior Armorer.

25.     At Triple Canopy, the primary responsibilities of an Armorer include the inspection of weapon systems, as well as the identification and repair of defective weapon systems.

### Triple Canopy's Contract with the State Department

26.     In 2014 and 2015, Triple Canopy had a base contract with the government to provide worldwide protective services to the State Department at the U.S. Embassy in Baghdad,

Iraq. Relator was assigned to this contract and performed armorer duties pursuant to the base

contract and task orders issued by the State Department to Triple Canopy pursuant to the base

contract.

27.     Upon information and belief, the contract was entitled SAQMMA10D0104 -

SAQMMA11F0677.

28.     As part of its provision of worldwide protective services at the Baghdad embassy,

Triple Canopy agree to provide armory and weapon maintenance services on government-issued

weapons in a government-furnished armory.

29.     Relator and his armorer coworkers were paid by Triple Canopy who billed the

State Department for their working time. Armorers regular tour of duty was six twelve-hour

days per week.

30.     At around the beginning of 2013, the Department of State and Tripel Canopy

agreed to Amendment 9, Revision 2, of Task Order 5 pursuant to the base contract. That

Amendment / Revision contained a Statement of Work.

31.     Section 6.16 of that Statement of Work was entitled "Armory and Weapons

Maintenance," and provided that "The Contractor shall comply with Section C.4.3.10.1.2,

Equipment Maintenance, of the Base Contract."

32.     Section C.4.3.10.1.2 "Equipment Maintenance" provided under the "Armorer,"

section that "The Contractor shall ensure that weapons are maintained in operable condition by

Contractor factory-certified armorer personnel, in accordance with factory specifications. The

Contractor shall employ armorers on-site to perform this maintenance. Contractor-provided

armorers shall be factory-certified for each weapon furnished under the Task Order by the

Government or Contractor if required in the Task Order."

<u>Triple Canopy Breaches its Obligation to Maintain Weapons in Operable Conditions in
Accordance with Factory Specifications and Creates False Inspection Records</u>

33.     One of Mr. Bachert's co-workers and fellow armorers in Baghdad was Mark
Fields.

34.     On or about October 6, 2014, co-worker Brian Kuhn informed Relator that his
(Mr. Kuhn's) weapon, an M4 rifle, fell apart in his (Mr. Kuhn's) hands.  After inspecting the
weapon, Relator determined that a nut had not been locked in place – an obvious defect easily
repaired.  After investigation, Relator determined that Mr. Fields had allegedly inspected the
weapon in July 2014.  *See* attached as **Exhibit 1.**

35.     Thereafter and on his own, Mr. Bachert examined other records from Mr. Fields.
Mr. Bachert learned, for instance, that Mr. Fields documented inspections of 49 rifles in one day.
Such a rate, without error or untruthfulness, is extremely unlikely.

36.     Upon information and belief, armorers can adequately inspect approximately 20-
25 weapons per day.

37.     Additionally, in anticipation of a State Department audit, Mr. Bachert discovered
that Mr. Fields had changed records in the Triple Canopy database to reflect that he (Mr. Fields)
had backdated a number of records showing that he (Mr. Fields) had performed Glock pistol
inspections in prior months that had never been performed.

38.     The weapons at issue are property of the United States government.

39.     Mr. Bachert disclosed this information to his supervisor, Robert Zalewski, who
responded by dismissively saying "Thank you."  Upon information and belief, neither Mr.
Zalewski nor Triple Canopy investigated this wrongdoing.

40.     In December 2014, Mr. Fields acknowledged to Mr. Bachert that he (Mr. Fields) falsified the database to show that certain guns had been inspected.  At that time, there was an impending State Department audit.

41.     On his own, Mr. Bachert examined Triple Canopy's records and realized that Mr. Fields had falsified records pertaining to the Glock 30 pistols.

42.     On December 13, 2014, Mr. Bachert sent an e-mail message to Mr. Zalewski noting that "Mark fabricated inspections on 30 Gluck (sic) pistols yesterday so no pistols would show over their inspection due date to the upcoming PMR.  IF (sic) you look at the data base for 12-11-14 and 12-12-14 you will see the discrepancy."  *See* attached as **Exhibit 2.**   Upon information and belief, neither Mr. Zalewski nor Triple Canopy investigated this wrongdoing.

43.     Upon information and belief, Triple Canopy continued billing the State Department for armory and armorer services for all armorers, including Mr. Fields, even after learning Mr. Fields was not actually maintaining weapons and was creating false records regarding his completion of armorer services.

44.     In January 2015, Triple Canopy moved Mr. Zalewski to another task order.

45.     On or about March 12, 2015, Mr. Ronald Funk approached Mr. Bachert with a SR-25 and complained that the scope was loose.  Mr. Bachert inspected the rifle and determined that the screws were so loose as to be ineffective.

46.     Mr. Bachert told Mr. Gene Eiing, Mr. Zalewski's replacement, about Mr. Fields' improper conduct.

 Mr. Bachert reported falsification of records and warned of potential criminal and civil liability

47.     Mr. Bachert sent a letter to his third line supervisor, Mr. Frank Laura (Program Manager) in which he stated, in part:

Sir it is with great reluctance and hesitation that I have to write you this letter. I reviewed TC's policies on open door, whistle blower, anti-harassment and the code of conduct but I'm concerned just the same. As I believe there have been some issues created because I spoke out.

I have reported my concerns in the past but with the personnel changes I'm not sure if they were ever addressed. In addition, recently there have been some schedule conflicts and I have received what I can only describe as retribution for not going along with the personal wishes of others.

Several months ago and again several weeks ago I reported to my supervisor that Mark Fields was conducting himself in an unethical manner in violation of several Triple Canopy polices and TO5 contractual requirements. His actions could cause civil/criminal liability for TC from both the State Dept. and other employees.

Mark Fields has put contractors, State Dept. officials and dignitaries lives at risk by failing to inspect the weapon systems in the armory as required by the TO5 Contract; however he records erroneous information in the armory data base. He records weapons were inspected when in fact they were never removed from the storage rack. On July 19, 2014 Mark recorded in the data base that he inspected approximately 49 rifles. Upon a rifle coming back into inventory (about 5 days after) I found simple deficiencies that would have been corrected if the weapon would have been properly inspected (weapon serial number W352103). In fact there are several recorded entries showing the weapons Mark inspected on July 19th, 2014 needed repair soon after his inspection.

On October 6th PSS Operator Kuhn reported to the armory and stated his weapon fell apart in his hands while he was out conducting training in the Texas lot. The weapon serial number is w353856 and this weapon was one of the 49 weapons Mark entered as being inspected on July 19,2014.

On December 12, 2014 upon hearing of an upcoming PMR inspection Mark changed over 30 Glock Pistols to show that they were inspected in case the State PMR Inspector were to look in our data base and see weapons are overdue for inspection. If you were to look at the data base it is clear he could not have inspected these weapons as they were issued out of the armory and with the shooters. This is clearly reflected on the data base dates of Decemeber12-13, 2014.  In both the rifle case and pistol case it is impossible to inspect those amounts of weapons in a single day.

Later in December, 2014 Mark told me to lie to the State inspector during the PMR if asked about the M249 firing pin gauging as we do not have a gauge. I told him I would not do that.  He then ordered me to write in false data in M249 round counts books due to receiving a core letter from the state and I refused to do so. Mark then bumped into me, grabbed the book out of my hand and screamed "Give me the book I'll do it".  I walked away so the situation could deescalate.  Mark then abruptly changed the armory SOP to reflect round count books and then lied to management when he was asked about it.

Around the 12 of March 2015 Ronald Funk brought a SR-25 into the armory complaining the rifle did not hold zero. The rifle serial number is KA060364. According to the data base Mark serviced the rifle on January 29, 2014. Upon inspection all of the scope screws were loose to the point the only thing holding the scope in place was the paint on the scope.

As far as the rest of the DDM rifles, the majority of the DDM rifles were out of factory specifications upon my arrival to the task order. It is clear they have not been properly serviced in some time. One M-24 rifle had a 7 lb trigger pull. The maximum factory trigger pull is 5 lbs. I then started inspecting the rifles and brought them into factory and State dept. specifications. I was informed by a previous armorer that initials are placed in the data base because of Mark's conduct and the other armorer did not want to get blamed for Mark's shortcomings.

If you were to look in the TO5 and RSO date base you would see weapons that have not been inspected since 2013. I recommend implementing a simple corrective action so we could bring all the weapons into compliance however Mark did not take any action. As a result there are weapons that have not been maintained in years which creates a dangerous situation.

*See* attached as **Exhibit 3.**

48.     On or about April 4, 2015, Mr. Bachert sent an e-mail to Mr. Laura stating:

Sir I just wanted to give you the courtesy and let you know I feel that it is in my best interest to contact HR Legal.  I'm doing this to protect myself as I have no advocate on my side and I have some verifiable concerns.

*See* attached as **Exhibit 4.**

49.     During the week of April 5, 2015, Mr. Bachert exchanged e-mails with Gearoid

Moore concerning protection from retaliation to which Mr. Bachert was entitled.

50.     Thereafter, Mr. Bachert spoke with Mr. Ronald Fite, his Triple Canopy supervisor

on the government side, and informed Mr. Fite about Mr. Fields' improper conduct with the data

base.  In accordance with its contract with the State Department, Triple Canopy was obligated to

track the type and quality of rounds fired by machine guns and sniper rifles at the State

Department shooting range.  Upon information and belief, Triple Canopy did not perform these

obligations.  However, after receiving a letter from the State Department, Mr. Fields changed the

operating procedures in the armory to show that he had issued "round count books" to all shooters, and fabricated supporting records.

51.     On or about April 23, 2015, Mr. Bachert was responsible for investigating a negligent weapon discharge.  After examining the weapon, Mr. Bachert determined that the parts were so worn that the trigger pull did not operate correctly and required only a light pull to discharge the weapon.  The weapon at issue allegedly had been inspected by Mr. Fields.

52.     The same day, Mr. Bachert issued a negligent Discharge Report to RSO Investigations.

<u>Triple Canopy Submitted False Claims for Payment to the Government</u>

53.     Throughout his employment with Triple Canopy, no one informed Mr. Bachert that his complaints and reports that Triple Canopy was not providing the armory and armorer services were investigated.

54.     Throughout his employment with Triple Canopy, no one informed Mr. Bachert that Triple Canopy stopped billing the State Department for armory and armorer services despite Triple Canopy not providing the services they agreed to provide pursuant to the base contract or Task Order 5.

55.     The only actions Triple Canopy took with respect to Mr. Bachert's reports were to transfer Mr. Bachert against his wishes, return him to the United States, and then reduce his pay.

56.     Upon information and belief, Triple Canopy continued to bill the State Department for armory and armorer services under the base contract and Task Order 5 despite knowing it was not entitled to payment for those services.

<u>Mr. Bachert was transferred, then sent home, and then constructively discharged<br>because of his reports regarding the falsification of records to supervisors</u>

57.     On or about May 20, 2015, the Armory Advisor from Basra, Mr. Rene Urena, called Mr. Bachert and advised that Mr. Bachert would be transferred from Baghdad to Basra.

58.     Several days later, Mr. Bachert received an Employee Counseling Form that directed him to report back to the United States for "Investigatory Leave."

59.     That same day, Mr. Bachert initiated a meeting with Mr. Laura to discuss the Employee Counseling Form.  Mr. Laura stated that Mr. Bachert was being sent back to the United States.

60.     In accordance with his instructions, Mr. Bachert returned to the United States and contacted Mr. Wallace Burnett in Triple Canopy's Human Relations office.  Mr. Bachert learned that he was being reassigned from the Baghdad embassy assignment to Irbil, Iraq, temporarily, for 30 days as an Armorer.  Thereafter, he again would be required to return to the United States to re-apply for a "supply" position.

61.     "Supply" positions are paid approximately $100 per day less than armorer positions.

62.     Triple Canopy deliberately required this reassignment and salary reduction to induce Mr. Bachert to quit his employment, to prevent Mr. Bachert from continuing his investigations and disclosures, and to assign Mr. Fields to oversee the armory.

63.     Defendant made the working conditions at Triple Canopy intolerable for Mr. Bachert, including but not limited to:

- unfounded accusations of lying;

- ignored and excluded from conversations by management;

- lack of cooperation from management;

- required to work on day off;

- failed to provide required documentation;

-  misrepresentation concerning identity of supervisor;

- failed to assist with scheduling problems;

- attempted to force Relator to submit a supply bio and take a lesser paying job.

64.     Mr. Bachert did not accept the reassignment to Irbil.

65.     Instead, Mr. Bachert sought employment elsewhere and requested release of his security clearance.

66.     At this time, Triple Canopy represented that its "client requested [Mr. Bachert's] removal."

67.     Mr. Bachert was not able to secure new employment for two months, and did not receive wages for two months, after his employment with Triple Canopy was terminated.

68.     After securing new employment, Mr. Bachert learned that Triple Canopy management and/or employees, including Mr. Fields, impermissibly told Mr. Bachert's current employer that he (Mr. Bachert) was fired because he filed a complaint with the State Department.

69.     This caused Relator's new employer to transfer him to the Baghdad airport base, a more dangerous post, with restricted outside communication and a location where there is no senior armorer position (thereby preventing a potential pay increase).  In addition, Relator lost time and experience for application to future potential opportunities.

70.     Defendant's actions shock Virginia's public policy.  In particular, Mr. Bachert was terminated because he refused to engage in a criminal act, namely permitting false claims

and false recordkeeping to be submitted by Triple Canopy.  Virginia has policies, *inter alia,* prohibiting forgery and obtaining money under false pretenses.

### Count I
### Violations of the False Claims Act
### 31 U.S.C. §3729 *et seq.*

71.     Paragraphs 1-59 above are hereby incorporated by reference as if set forth fully herein.

72.     This Count is brought by Mr. Bachert in the name of the United States under the qui tam provisions of 31 U.S.C. §3730 for the Defendant's violations.  §3729 (a)(1).  This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §3729-32.

73.     As described in this Complaint, Defendant by and through its officers, agents and employees (a) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; and (b) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government.

74.     By virtue of the above-described acts, Defendant knowingly caused to be presented false or fraudulent claims for payment or approval, and possibly continues to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees, or agents of the United States.

75.     The United States, being unaware of the falsity of the claims caused to be made by the Defendant, and in reliance on the accuracy thereof paid and may continue to pay for the Defendant's misconduct.  All unlawful conduct described above may have continued after Mr. Bachert's termination with Triple Canopy.

76.     The amounts of the false or fraudulent claims to the United States were material.

WHEREFORE, Plaintiff/Relator prays for judgment against Defendant as follows: (1) That Defendant cease and desist from violating 31 U.S.C. §3729 *et seq.;* (2) That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000.00 and not more than $11,000.00 for each violation of 31 U.S.C. §3729 *et seq.*; (3) That Plaintiff/Relator be awarded the maximum amount allowed pursuant to §3729(d) of the False Claims Act; (4) That Plaintiff/Relator be awarded damages under 31 U.S.C. §3730(h)(2) including two times the amount of back pay, and interest on the back pay; (5) That Plaintiff be awarded all costs and expenses of this action, including attorneys' fees; and (6) That Plaintiff/Relator recover such other relief as the Court deems just and proper.

### Count II
### Violation of Anti-Retaliation Provisions of the False Claims Act
### <u>31 U.S.C. §3730(h)</u>

77.     Paragraphs 1-59 above are hereby incorporated by reference as if set forth fully herein.

78.     Under 31 U.S.C. §3730(h) of the False Claims Act, employer retaliation against "whistle-blowers" is prohibited.

79.     Mr. Bachert engaged in protected activity under the False Claims Act.

80.     Mr. Bachert's consistent opposition to false weapons inspections and false recordkeeping led to his termination.  Mr. Bachert was developing qui tam claims and was terminated for that reason.

81.     Triple Canopy knew of the protected activity.

82.     Mr. Bachert specifically warned Triple Canopy of the possibility of a civil action.

83.     In furtherance of a potential qui tam action, Mr. Bachert did more than report a concern to a supervisor of a mischarging to the government.  Mr. Bachert engaged in protected activity when he made clear to Triple Canopy that there was a reasonable possibility of qui tam litigation by complaining that Triple Canopy's conduct was clearly illegal.

84.     Triple Canopy retaliated against Mr. Bachert as a result of Mr. Bachert's actions.

85.     Defendant discriminated against Relator Bachert in the terms and conditions of his employment for attempting to stop Defendant's violations of the Act when Defendant terminated Relator's employment.

86.     Relator has suffered substantial damages as a result of Defendant's wrongful conduct.  Under 31 U.S.C. §3730(h), Relator is entitled to compensation for damages he sustained as a result of Defendant's conduct.

87.     Relator has suffered pain and suffering and severe emotional distress as a result of Defendant's aforementioned intentional, reckless conduct.

88.     Relator has suffered emotional distress as a result of Defendant's extreme and outrageous conduct.

WHEREFORE, Relator demands judgment against Defendant as follows: (1) compensatory damages in an amount totaling $1,000,000.00; (2) punitive damages in the amount of $1,000,000.00; (3) pain and suffering damages in the amount of $1,000,000.00; (4) reimbursement of all attorney's fees; (5) payment of all costs associated with this action; (6) pre- and post-judgment interest as permitted by law; and (7) such other and further relief as this Court deems proper.

## Count III

### Wrongful Termination in Violation of Public Policy, Va. Code Ann. § 18.2-178

89.     Relator repeats and realleges the allegations above, as if fully set forth herein.

17

90.     Section 18.2-178 of the Virginia Code, *inter alia*, provides that obtaining money by false pretense with intent to defraud is a Class 4 felony.

91.     By complaining about Defendants' attempt to require her to participate in a violation of Virginia Code Section 18.2-178, Relator refused to engage in statutorily prohibited conduct.

92.     Defendants, jointly, terminated Relator because he refused to engage in violations of 18.2-178 and contacted his supervisors and then Triple Canopy's human resources and legal department.

93.     Defendants, jointly, violated a policy enabling the exercise of an employee's statutorily created right.

94.     Defendants' actions were intentional, reckless, and malicious.

95.     In addition, as set forth above, Defendant made the working conditions at Triple Canopy intolerable for Mr. Bachert.

96.     Relator has suffered substantial damages as a result of Defendant's wrongful conduct in an amount totaling $100,000.00.

WHEREFORE, Relator demands judgment against Defendant as follows: (1) compensatory damages in an amount totaling $100,000.00; (2) punitive damages in the amount of $350,000.00; (3) reimbursement of all attorney's fees; (4) payment of all costs associated with this action; (5) pre- and post-judgment interest as permitted by law; and (6) such other and further relief as this Court deems proper.

## JURY DEMAND

Relator demands a trial by jury to the maximum extent permitted by law.

Respectfully submitted,


By:      ___/_____
         Jack Jarrett (VSB#86176)
         Alan Lescht and Associates, P.C.
         1050 17th Street, N.W.
         Suite 400
         Washington, D.C. 20036
         (202) 463-6036 (tel.)
         (202) 463-6067 (fax)
         jack.jarrett@leschtlaw.com
         *Counsel for Relator*


Dated:  July 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2017, I filed the foregoing using the courts

CM/ECF system, which will automatically serve counsel of record in this case.


         /s/_____

         Jack Jarrett