## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA, ex rel.** ) | |
| **STEPHEN BACHERT** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:16-cv-456 |
| v. ) | (TSE/JFA) |
| ) | |
| **TRIPLE CANOPY, Inc.** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### <u>Memorandum of Law in Opposition to Defendant's Motion to Dismiss</u>

Defendant Triple Canopy, Inc. entered a contract with the State Department to provide protective services for the U.S. Embassy in Baghdad, Iraq.  As part of that contract, Triple Canopy agreed to provide armorer services and ensure that "weapons are maintained in operable condition by [Triple Canopy] factory-certified armorer personnel, in accordance with factory specifications."

From July 2014 until at least May 2015, Triple Canopy **<u>did not</u>** ensure that "weapons [were] maintained in operable condition," and instead falsified records showing the armory performed required inspections and maintained round counts for weapons.  By at least December 2014, Triple Canopy knew it was not maintaining weapons in operable conditions according to factory specifications and that it had created fake records falsely showing compliance.  However, Triple Canopy did not correct its failure to provide armory services.  Instead, Triple Canopy continued to falsely purport to provide the services it agreed to provide.  It is reasonable to infer Triple Canopy billed the government for these services.

Triple Canopy's actions violated the False Claims Act ("FCA") because Triple Canopy knowingly presented false claims for payment for armorer services to the government and made and used false records material to its false claims.

Triple Canopy also violated the FCA's anti-retaliation provision.  Relator Stephen Bachert complained to a government-employed supervisor about Triple Canopy's failure to provide adequate armory services in April 2015, approximately a month after he warned his Triple Canopy chain of command of potential civil liability based on their non-compliance with the State Department contract.  On May 20, 2015, Triple Canopy transferred Bachert from Baghdad to Basra, Iraq, and then several days later, home on "Investigatory Leave."  Back in the United States, Triple Canopy assigned Bachert to a thirty-day assignment in Irbil, Iraq, and then told him he would have to reapply for a non-guaranteed supply position that paid approximately $100 less per day than his current position.  Bachert requested that Triple Canopy release his security clearance so he could look for other work and Triple Canopy then stated he was removed from work on Triple Canopy's contract at the request of the government.

## FACTS

### Triple Canopy's Contract with the State Department

1.     In 2014 and 2015, Triple Canopy had a multi-year, multimillion dollar contract (the "Base Contract") with the U.S. Department of State to provide security to State Department officials in Baghdad, Iraq.  As part of this contract, Triple Canopy agreed to provide armory and weapon maintenance services on government-issued weapons in a government-furnished armory. (Doc. 30, Am. Compl. ¶¶ 2, 26-29).

2.     Triple Canopy and the State Department agreed to Amendment 9, Revision 2, of Task Order 5 pursuant to the Base Contract at around the beginning of 2013.  This agreement

contained a Statement of Work.  Section 6.16 of the Statement of Work was entitled "Armory and Weapons Maintenance," and provided that "The Contractor shall comply with Section C.4.3.10.1.2, Equipment Maintenance, of the Base Contract."  (Doc. 30, Am. Compl. ¶¶ 30-31).

3.      In turn, Section C.4.3.10.1.2 provides under its "Armorer" section that

"The Contractor shall ensure that weapons are maintained in operable condition by Contractor factory-certified armorer personnel, in accordance with factory specifications.  The Contractor shall employ armorers on-site to perform this maintenance.  Contractor-provided armorers shall be factory-certified for each weapon furnished under the Task Order by the Government or Contractor if required in the Task Order."

(Doc. 30, Am. Compl. ¶ 32).

4.      Relator Stephen Bachert joined Triple Canopy as an armorer in early 2014 and worked at the Baghdad Embassy pursuant to the Base Contract and Task Order 5.  Bachert and his armorer coworkers were paid by Triple Canopy who billed the State Department for their working time.  Armorers' regular tour of duty was six twelve-hour days per week.  (Doc. 30, Am. Compl. ¶¶ 24, 29).

5.      The maintenance of weapons in accordance with factory specifications required Triple Canopy to perform an annual inspection of each weapon using gauges and inspection of key areas of the weapons as specified in the manufacturer service manuals.  (Doc. 30, Am. Compl. ¶ 3).

6.      Separately, Triple Canopy's contract with the State Department required Triple Canopy's armorers to maintain round count data books for machine guns and sniper rifles.  (Doc. 30, Am. Compl. ¶ 3).

<u>Triple Canopy Breached Its Obligation to Maintain Weapons in Operable Conditions</u>
<u>According to Factory Specifications and Failed to Maintain Round Count Data</u>

7.      On October 6, 2014, Triple Canopy employee Brian Kuhn informed Bachert that his M-4 rifle fell apart in his hands.  Bachert inspected the weapon and determined that a nut had not been locked in place.  Bachert reviewed Triple Canopy's inspection records and saw that Triple Canopy armorer Mark Fields had supposedly inspected the rifle on July 19, 2014.  (Doc. 30, Am. Compl. ¶¶ 33-34, Ex. 1).

8.      Bachert then examined other inspection records and discovered that Fields had claimed to have inspected forty-nine rifles on July 19 even though Bachert's experience was that an armorer working as fast as possible can only adequately inspect between twenty and twenty-five rifles in a twelve-hour shift.  (Doc. 30, Am. Compl. ¶¶ 35-36).

9.      In reviewing records, Bachert saw that he previously had to repair a rifle with serial number W352103 just five days after Fields had supposedly inspected it among forty-nine rifles on July 19, 2014.  Bachert saw that the deficiencies he corrected on July 24 should have been discovered had the rifle actually been inspected on July 19.  (Doc. 30, Am. Compl. ¶ 47).

10.     In December 2014, Triple Canopy faced a Program Management Review ("PMR") that covered the armory and armory services.  Fields falsified Triple Canopy's inspection records to conceal that the armory's Glock 30 pistols were past due for inspection. Fields openly admitted to Bachert that he falsified the records to show compliance with Triple Canopy's obligations to maintain operational weapons in accordance with factory specifications. Bachert again reviewed records pertaining to the Glock 30s and saw that many were actually in use out in the field on the days Fields claimed to have inspected the weapons in the armory. (Doc. 30, Am. Compl. ¶¶ 40-42).

11.     On March 12, 2015, Ronald Funk gave Bachert an SR-25 rifle with a loose scope. Bachert examined the rifle and determined that the scope screws were too loose for the rifle to be used effectively.  (Doc. 30, Am. Compl. ¶ 45).

12.     In April 2015, the State Department sent a letter to Triple Canopy seeking information about the armory's round counts.  Pursuant to its contract with the State Department, Triple Canopy was required to track the type and quantity of rounds fired by machine guns and sniper rifles at the State Department shooting range.   Triple Canopy had not met this requirement.  Fields created fake operating procedures that showed he had provided round count books to all shooters and also created fake records showing that the armory kept records of fired rounds.  (Doc. 30, Am. Compl. ¶¶ 3, 50).

13.     On April 23, 2015, Bachert investigated a negligent weapon discharge and discovered that the parts in the weapon were so worn that the trigger did not operate correctly and only required a light pull to fire.  (Doc. 30, Am. Compl. ¶ 51).

<u>Triple Canopy Knew of Its Failure to Provide Armory and Armorer Services<br>in Compliance with the Base Contract and Task Order 5</u>

14.     In December 2014, Bachert informed his first-line Triple Canopy supervisor, Robert Zalewski, that Fields had falsified the inspection database to show that he had inspected forty-nine rifles on July 19, 2014.  Bachert explained that several of the rifles had failed or required repairs that would have been discovered had Fields inspected the weapons.  Zalewski dismissively thanked Bachert for his report and took no actions to correct Triple Canopy's non-compliance with Task Order 5.  (Doc. 30, Am. Compl. ¶¶ 34-42).

15.     On December 13, 2014, Bachert informed Zalewski that Fields admitted he falsified the inspection database for the Glock 30s.  (Doc. 30, Am. Compl. ¶ 42).

16.     In March 2015, Bachert told Gene Eiing, who had assumed Zalewski's supervisory role for Triple Canopy, about Fields's improper failure to inspect the weapons and his falsification of inspection records.  (Doc. 30, Am. Compl. ¶ 46).

17.     After Eiing did not act on Bachert's complaint, Bachert emailed Program Manager Frank Laura and informed him of his complaints to supervisors in December and March.  Bachert told Laura that Fields was violating Task Order 5 requirements and that Fields's actions could cause Triple Canopy civil or criminal liability.  Bachert notified Laura that Fields had not inspected weapons as required by Task Order 5 and had falsified records in the armory database.  (Doc. 30, Am. Compl. ¶ 47).

18.     When Laura did not act, Bachert contacted State Department security officer Ronald Fite, who supervised Bachert on behalf of the State Department, and informed him of Triple Canopy's failure to comply with the requirements of Task Order 5.  (Doc. 30, Am. Compl. ¶ 50).

<u>Triple Canopy Ignored Bachert's Complaint and Continued Employing Fields</u>

19.     Through May 20, 2015, when Bachert was transferred away from the Baghdad Embassy, no one informed Bachert that his complaints were investigated or that Triple Canopy stopped billing the State Department for armory or armorer services that Triple Canopy was not actually providing.  Bachert, who had access to the inspections records, did not see that Triple Canopy corrected the false inspection or round count records.  (Doc. 30, Am. Compl. ¶¶ 53-54).

20.     Fields continued working in the State Department armory.  (Doc. 30, Am. Compl. ¶ 62).

21.     Based on this information, Bachert believes that Triple Canopy continued billing the State Department for armory and armorer services after Triple Canopy learned from him that

it was not in compliance with the fundamental requirement of its agreement to provide armorer services and maintain operational weapons.  (Doc. 30, Am. Compl. ¶ 56).

<u>Triple Canopy Constructively Discharged Bachert</u>

22.     On May 20, 2015, Triple Canopy transferred Bachert from the Baghdad Embassy to Basra, Iraq.  Within a few days, Bachert received an Employee Counseling Form that directed him to return to the United States for "Investigatory Leave."  When he returned to the United States, Triple Canopy told Bachert that he would be assigned to Irbil, Iraq for thirty-days and then would have to reapply for a supply position that paid $100 less per day than armorer positions.  (Doc. 30, Am. Compl. ¶¶ 57-61).

23.     In the months after Bachert reported Triple Canopy's non-compliance with the Base Contact and Task Order 5, Triple Canopy supervisors made unfounded accusations of lying against Bachert, ignored and excluded Bachert from meetings, required Bachert to work his day off, failed to provide Bachert required documentation or to assist Bachert in dealing with scheduling problems, and then removed him from his armorer position with only the hope of winning a lower-paying supply position.  (Doc. 30, Am. Compl. ¶ 63).

24.     Bachert asked that Triple Canopy release his security clearance and began looking for other jobs.  In response, Triple Canopy claimed that Triple Canopy removed Bachert at the State Department's request.  (Doc. 30, Am. Compl. ¶¶ 64-66).

25.     Bachert filed his original complaint under seal in April 2016.  After the United States ultimately decided not to intervene, the case was unsealed on March 7, 2017.

## ARGUMENT

The Amended Complaint adequately states a claim that Triple Canopy violated the FCA by (1) knowingly presenting false claims for payment for armory and armorer services to the

Department of State that Triple Canopy did not actually perform and (2) knowingly making false records material to those false claims.   The allegations meet the pleading standards of Rule 12(b)(6) with respect to the materiality of the false representations on the government's decision to pay.   The government pays for armory and armorer services to ensure its weapons are "maintained in operable condition."   Common sense dictates that the government would not pay for the armory and armorer services if it knew that those services were not being performed, and that consequently, weapons failed in the field.   Triple Canopy's acts demonstrate the materiality of its false certification as Triple Canopy created and then concealed the creation of false records demonstrating the adequate performance of the armorer services.

The allegations also sufficiently state the "who, when, what, where, and how," of the false claims to meet the heightened pleading requirements of Rule 9(b).

The Amended Complaint also adequately alleges Triple Canopy retaliated against Relator Stephen Bachert in violation of the FCA.   Bachert engaged in protected activity by complaining about and attempting to stop Triple Canopy from violating the requirements of its contract with the government in a manner that he stated "could cause civil/criminal liability for [Triple Canopy] from both the State Dept. and other employees."

### I.   Standard of Review for Motions to Dismiss Pursuant to Rules 12(b)(6) and 9(b)

A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).   When ruling on a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff.   *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

When alleging fraud, Federal Rule of Civil Procedure 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. Proc. 9(b).  Claims pursuant to the FCA's presentment and records clauses are subject to the pleading requirements of Rule 9(b).  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Claims of retaliation in violation of the FCA's anti-retaliation provision are not subject to Rule 9(b)'s particularity requirements but are subject instead to Rule 8(a)'s notice pleading standard.  *Young v. CHS Middle East, LLC*, 611 Fed. App'x 130, 134 (4th Cir. 2015).  At the motion to dismiss stage, a reviewing court is "obligated to view only the [plaintiff's] pleadings, and to view them generously in the [plaintiff's] favor."  *Id.* at 133.

## II.     The Amended Complaint Plausibly Alleges Triple Canopy Violated 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

The FCA, 31 U.S.C. 3729 *et seq.*, is "the primary vehicle by the Government for recouping losses suffered through fraud." H.R. Rep. No. 660, 99th Cong., 2d Sess. 18 (1986). As relevant here, the FCA prohibits any person from knowingly making "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B).  Actual knowledge of falsity is not required; instead, the FCA defines "knowledge" broadly to include deliberate ignorance and reckless disregard of the truth. 31 U.S.C. § 3729(b)(1). The FCA imposes civil penalties and treble damages as a remedy for violations. 31 U.S.C. § 3729(a).

To state a claim for violations of either Section 3729(a)(1)(A) or 3729(a)(1)(B) a relator must plead: "(1) "there was a false statement or fraudulent course of conduct; (2) made or carried

out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Phipps v. Agape Counseling & Therapeutic Servs.*, Civil Action No. 3:13-CV-166, 2015 U.S. Dist. LEXIS 67262, at *11 (E.D. Va. May 21, 2015) (internal citations omitted).

In *Universal Health Services, Inc. v. United States ex rel. Escobar* (hereinafter "*Universal Health*"), the Supreme Court recognized the implied certification theory of liability under the FCA.  136 S. Ct. 1989, 1995 (2016).  Pursuant to this theory, a contractor can be liable under the FCA when it submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.*  In addition, the Court held that liability "does not turn upon whether those requirements were expressly designated as conditions of payment" because "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 176-77 (4th Cir. 2017) (quoting *Universal Health*, 136 S. Ct. at 1996).

A. <u>Bachert Plausibly Alleges Triple Canopy Knowingly Made False Statements and Made and Used False Records.</u>

A claim for payment is false if it contains a misleading half-truth, i.e., "a representation that states the truth only so far as it goes, while omitting crucial qualifying information." *Universal Health*, 136 S. Ct. at 2000.  There is no requirement that the claim for payment contain an express false representation.  *Id.*  Rather, a defendant's failure to disclose its non-compliance with material statutory, regulatory, or contractual requirements can make its partial representations a misleading half-truth.  *Id.* at 2001.

The Fourth Circuit recently considered the question of falsity in light of *Universal Health* in *United States v. Triple Canopy*, 857 F.3d 174, 178 (4th Cir. 2017).  In *Triple Canopy*, the Fourth Circuit found that the defendant's billing the government for "guards," despite knowing those "guards," could not meet the marksmanship requirements of the contract between the defendant and government was an actionable half-truth under the FCA.  *Id.* at 178.  The court did not require the relator allege more than that the defendant submitted claims for payment knowing that its guards were not meeting the core requirement of the contract to allege falsity. *Id.*

*Triple Canopy* is directly on point with this case.  Here, Triple Canopy knew it was not in compliance with the core requirement of its contract with the State Department, i.e., "to ensure that weapons were maintained in operable conditions by Contractor factory-certified armorer personnel, in accordance with factory specifications."  Triple Canopy also knew that it had not performed required annual inspections and had created and used false inspection records.  Yet, Triple Canopy continued to act as though it was providing the armory services it was contractually obligated to provide and continued to employ and pay armorers.  As explained *infra*, at Section III(B)(ii), it is reasonable to infer that Triple Canopy billed the State Department for these services.  This is a false claim under the Fourth Circuit's decision in *Triple Canopy*.

B.  <u>Bachert Plausibly Alleges that Triple Canopy's False Statements and False Records Were Material to the State Department's Decision to Pay.</u>

In *Universal Health*, the Supreme Court also considered the third element of a FCA claim: that the false representations are material to the government's decision to pay the claim. 136 S. Ct. at 2002-04.  The Supreme Court held that while false representations of minor or insubstantial non-compliance are not material, false certifications that have a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," are

material.  *Universal Health*. 136 S. Ct. at 2002-03 (*quoting Neder v. United States*, 527 U.S. 1, 16 (1999).  The Supreme Court also held that the government's decision to expressly designate a particular contract provision as a condition of payment was not required for that condition to be material, nor was it dispositive proof that the condition was material.  *Universal Health*, 136 S. Ct. at 2003-04.

The nature of the false statement is central to the materiality analysis.  *Id.  Universal Health* points to *United States ex rel. Marcus v. Hess*, as a prototypical example of a material false statement, where the Supreme Court held the government would never had paid bids had they known the bids were the product of collusion.  *Id.* at 2003 (*quoting United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

The Fourth Circuit considered materiality post-*Universal Health* in *United States v. Triple Canopy*.  857 F.3d at 178-79.  Tellingly, the Fourth Circuit pointed to an example of materiality cited in *Universal Health* that coincides almost identically to the facts of this case:

> "A defendant can have "actual knowledge" that a condition is material without the Government expressly calling it a condition of payment. If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out."

*Id.* at 179 (quoting *Universal Health*, 136 S. Ct. at 2001-02).  The Fourth Circuit also noted that the defendant's efforts to falsify documents to cover its non-compliance was evidence of the defendant's knowledge that its non-compliance was material.  *Id.* at 178-79.

Here, the State Department contracted with Triple Canopy to provide armory services to ensure, more or less, that the government's guns actually shoot when called upon.  A reasonable

person would know that the State Department would not pay for armory services to maintain weapons that were not actually provided, leading to the failure of guns that Triple Canopy is contractually obligated to maintain.

Further, Triple Canopy knew its employees had taken actions to falsify inspection databases prior to a State Department program review in December 2014 and round count books in response to a State Department letter in April 2015.  Yet, Triple Canopy did not correct these false statements.  That these records are (1) kept and (2) were falsified evidences the materiality of Triple Canopy's non-compliance with the contract as the State Department reviewed this information in determining Triple Canopy's performance under the contract.  The facts of this case are the archetypal example of materiality in the FCA-context, as demonstrated by *Universal Health*.  Triple Canopy's argument to the contrary is plainly wrong.

    C.   <u>Bachert Plausibly Alleges that Triple Canopy's False Statements and Records Caused the State Department to Pay Triple Canopy.</u>

The Amended Complaint also plausibly alleges that Triple Canopy's false statements and records caused the State Department to pay Triple Canopy.  As explained more-fully *infra* at Section III(B)(ii), Triple Canopy acted as though it was providing armory services under its contract with the State Department, thus entitling it to bill the State Department for those armory services.  Even though Bachert has not seen the specific invoices Triple Canopy submitted, the only logical conclusion that can be drawn from Triple Canopy's continued provision of deficient armory services under its bilateral contract with the State Department is that Triple Canopy billed the State Department for providing those services.

**III.    The Amended Complaint Satisfies Rule 9(b)'s Particularity Requirement**

"Rule 9(b) requires that '[a FCA] plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the

misrepresentation and what he obtained thereby.'" *Smith v. Clark/Smoot/Russell, A JV*, 796 F.3d 424, 432 (4th Cir. 2015) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 634 (4th Cir. 2015).   And generally, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

In other words, plaintiffs must state the "who, what, when, where and how of the alleged fraud." *Smith v. Clark/Smoot/Russell*, 796 F.3d at 432.   The Amended Complaint sufficiently alleges each.

### A.   The Amended Complaint Alleges "Who" Violated the FCA

The allegations that Triple Canopy violated the FCA are sufficient to allege the "who" required by Rule 9(b).   Bachert alleges that Triple Canopy violated the FCA by seeking payment for armory services Triple Canopy knew it was not providing and by making and using false records material to its false claims.   This allegation is sufficient to meet Rule 9(b) and there is no requirement that Bachert identify the individual employee responsible for sending the invoices to the State Department.   *Smith v. Clark/Smoot/Russell*, 796 F.3d at 432-433.

In *Smith v. Clark/Smoot/Russell*, the relator construction worker alleged that a joint venture and the construction companies that made up the joint venture violated the FCA by falsely certifying their compliance with the Davis Bacon Act and billing the government at higher rates than it paid workers.   796 F.3d at 432-33.   The Fourth Circuit held that identifying the defendant companies' fraud was sufficient to plead "who" violated the FCA to satisfy Rule 9(b)'s particularity requirement.   *Id.* at 433 ("[i]n sum, the complaint identified who committed

fraud—Defendants. . . .   These allegations pass Rule 9(b) muster.").   The court did not require the relator to name the individual employee that sent the invoices.   *Id.*   Triple Canopy's argument that relators are required to identify individual employees to meet Rule 9(b) is incorrect.

Triple Canopy is also incorrect that Bachert needs to allege that the *individual* submitting the invoices for the armorer services knew the claims were false to sufficiently allege that Triple Canopy violated the FCA.   The individual submitting the claim on behalf of the defendant need not know the claim contains a false certification of entitlement to payment if another employee knows the defendant is wrongfully seeking government funds.   *United States, ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 919 (4th Cir. 2003).   There is also no requirement that the individual with knowledge of the wrongful conduct know the details of the false certification of entitlement to payment.   *Id.* (stating "we decline to adopt [defendant's] view that a single employee must know both of the wrongful conduct and the certification requirement.").

Bachert alleges that his colleague, Fields, two of his first-line supervisors, Zalweski and Eiing, and his program manager, Laura, were aware of the wrongful conduct that the armory was not providing armory services in accordance with Task Order 5 and the Base Contract.   The knowledge of these individuals is imputed to Triple Canopy.   *Id.* at 920, n. 12 (citing *Grand Union Co. v. United States*, 696 F.2d 888, 888-91 (11th Cir. 1983) (which held that the knowledge of employees could be imputed to their employer)).

B. <u>The Amended Complaint Alleges "What" and "How" Triple Canopy Gained by Its Submission of False Claims, the Subject Matter of the False Claims, and there is Reliable Indicia that Triple Canopy Submitted False Claims.</u>

       i.     *Bachert alleges the "what" and "how" of the false claims.*

Rule 9(b) requires a relator to allege "what" the defendant obtained by making the false representation. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). The allegations that Triple Canopy wrongfully received payment for armory and armorer services meets this requirement.

Rule 9(b) also requires relators to allege "what" was the subject matter of the false claim and "how" the claims were false. *Smith v. Clark/Smoot/Russell, A JV*, 96 F.3d 424, 431-33 (4th Cir. 2015). Here, Bachert identifies both the Base Contract and the Amendment and Revision to the Task Order under the Base Contract that governed Triple Canopy's provision of armory services. Bachert also alleges the precise language of the provision of the Base Contract (which was incorporated into Task Order 5) that Triple Canopy breached, as well as requirements such as performing annual inspections and maintaining round count books that Triple Canopy did not perform. Further, Bachert identifies specific databases Triple Canopy armorer Fields falsified and the specific serial numbers of weapons that failed because they were not inspected as the false database showed.

Last, Bachert alleges that he and his coworkers were paid by Triple Canopy, who in turn was paid by the State Department, to provide armory and armorer services in compliance with the Base Contract and Task Order. Bachert's allegations that Triple Canopy knowingly breached its central obligation to maintain weapons in operable condition from at least December 2014 until May 2015, yet continued to purport to provide armory and armorer services, and upon

information and belief, billed for those services, sufficiently describes the "what" and "how" of

the false statement to meet Rule 9(b).  *See, e.g., Smith*, 796 F.3d at 432 (holding that the relator

sufficiently identified false claims by identifying the contracts under which the defendants

submitted false claims, the parties to the contracts and the work performed under the contracts,

and the requirement the defendants falsely certified they complied with in billing the government

under the contract).

> ii.     *The Amended Complaint surpasses Rule 9(b) because there is reliable indicia that Triple Canopy submitted false claims for payment pursuant to its bilateral contract with the State Department.*

Triple Canopy's contention that the Amended Complaint fails to state a claim because

Bachert does not specifically identify the invoices Triple Canopy sent the State Department is

incorrect and the cases Triple Canopy cites for this proposition are inapposite to a situation

where there is a bilateral contract between the government and the entity allegedly submitting

false claims.  "Rule 9(b) requires that 'some indicia of reliability' must be provided in the

complaint to support the allegation that an actual false claim was presented to the government."

*United States ex rel. Nathan v. Takeda Parms. N. Am., Inc.* 707 F.3d 451, 457 (4th Cir. 2013)

(hereinafter "*Nathan*").

In *Nathan*, the Fourth Circuit held that when a defendant's actions, as alleged and as

reasonably inferred from the allegations, "*could* have led, but *need not necessarily* have led, to

the submission of false claims, a relator must allege with particularity that specific false claims

were actually presented to the government for payment."  *Id.* (emphasis in original).  The reverse

of this is that if a defendant's actions, as alleged and reasonably inferred from the allegations,

necessarily led to the submission of false claims, a relator need not allege with particularity the

individual false claims.  *See id.*

*United States ex rel. Grubbs v. Kanneganti*, a Fifth Circuit decision discussed by the *Nathan* court, illustrates how this works.   565 F.3d 180, 192 (5th Cir. 2009) (hereinafter (*Grubbs*").   In *Grubbs*, a psychiatrist alleged that two colleagues informed him of a scheme they engaged in and directed him to falsely bill for services that were not performed.  *Id.* at 184.  The complaint alleged that a nurse later attempted to assist the psychiatrist in improperly billing, the dates on which the two colleagues falsely claimed to have provided services, and the billing code they would have used to bill for the services.  *Id.* at 191-192.  The complaint did not, however, identify specific invoices or amounts the doctors submitted to the government for payment.  *Id.* at 192.  The Fifth Circuit determined that under those facts, it was appropriate to draw the inference that the hospital's billing system presented claims for services that were not provided and that therefore the complaint was pleaded with sufficient particularity.  *Id.*  The court stated it would be illogical to infer that the defendants did not bill for the services they went through the trouble of falsely recording.  *Id.*

In this case, there is a bilateral contract between the State Department and Triple Canopy for Triple Canopy to provide armorer and armory services that Triple Canopy actually did not provide.  Like the psychiatrist in *Grubbs*, Bachert identifies the specifics underlying the claims, including (1) his colleague's admission that he falsified inspection records before a State Department review; (2) the date weapons inspections were supposedly carried out but were not; and (3) specific serial numbers for weapons that failed because they were not inspected or maintained in accordance with the contract.  Because Triple Canopy employed and paid armorers as if it was providing armorer services pursuant to their contract to bill the State Department for those services, the only logical inference is that Triple Canopy indeed billed for those services. As in *Grubbs*, it would be illogical to assume that Triple Canopy went through the trouble of

providing armorers and maintaining false records but then did not bill the State Department for those armorers.

The cases Triple Canopy cites in support of its argument that Bachert must identify specific invoices are inapplicable to the facts of this case.  The Eleventh Circuit's decision in *United States ex rel. Clausen v. Lab. Corp. of Am.* (hereinafter "*Clausen*") is inapposite because in that case there was no evidence that the defendant's provision of unnecessary services to third-parties was billed to the government. 290 F.3d 1301, 1313 (2002).  In *Clausen*, the defendant allegedly provided unnecessary services to patients but there was no identification that the government was billed for those unnecessary services (which would have constituted false claims under federal regulations).  *Id.*  In contrast, here, the only parties involved are Triple Canopy and the State Department.   It would be unreasonable and improper to draw an inference that Triple Canopy's invoices for services were not paid by the State Department or that Triple Canopy did not bill the State Department even though it continued to act as though it was providing armory services in compliance with the contract despite knowing it was not.

The other cases Triple Canopy cites are inapplicable because in each, the relator failed to allege that the respective defendants' claims for payment were false.  In *Nathan*, the Fourth Circuit did not draw an inference that the defendant submitted false claims to the government because the relator could not plausibly connect alleged off-label marketing of a drug with actual off-label prescriptions.  *Id.* at 458-461.  There had to be off-label prescriptions for the defendant to breach its obligation not to bill the government for off-label uses of a drug.  *Id.*  Here, Bachert describes the equivalent of actual off-label prescriptions by alleging that Triple Canopy was not providing services in compliance with the contract, and thus breaching its obligation not to bill for services it was not providing.

Triple Canopy's reliance on *United States ex rel. Lawson v. Aegis Therapies, Inc.* (hereinafter "*Lawson*") and *United States ex rel. Ahumada v. NISH* (hereinafter "*Ahumada*") is misplaced for the same reason.  No. CV 210-072, 2015 U.S. Dist. LEXIS 45221, at *33 (S.D. Ga. Mar. 31, 2015); 756 F.3d 268, 280 (4th Cir. 2014).  In *Lawson* (at summary judgment), there was no evidence that the defendant breached its obligation to the government by submitting claims for payment for medically unnecessary services for any identifiable patient.  *Id.* at *33. Accordingly, there was no evidence that the claims the defendant submitted were false.  *Id.* Likewise, in *Ahumada*, the relator did not plead that the defendant submitted false claims in breach of its contractual obligation to the government.  756 F.3d at 281.  The defendant's contract with the government prohibited it from selling the government items fully produced by subcontractors.  *Id.*  The relator alleged that the defendant purchased fully completed items from the subcontractor.  *Id.*  But the relator did not allege that the relator sold those fully completed items to the government.  *Id.*  Accordingly, there was no allegation that the defendant billed the government for items in breach of its contract with the government.  *Id.*

Bachert's allegations do not suffer from these defects.  He specifically alleges how Triple Canopy breached its obligation to provide armory services yet continued to act as though it was providing compliant services and employ and pay armorers.  Thus, Bachert sufficiently puts Triple Canopy on notice of the details of the alleged scheme to submit false claims.

Bachert also describes in detail facts supporting his allegations—up to the serial number of weapons that were not inspected as Triple Canopy claimed—and thus demonstrates that his claims are neither spurious nor a fishing expedition.   Although he does not have prediscovery details of the invoices Triple Canopy submitted, it is reasonable to infer that Triple Canopy billed the government pursuant to the parties' contract even though Bachert has not identified the

specific invoices Triple Canopy sent the State Department for the services Triple Canopy was not actually providing.  This is sufficient under Rule 9(b).[1]

      C.  <u>The Amended Complaint Alleges "When" Triple Canopy Failed to Comply with the Requirement of Its Contract with the State Department and "When" Triple Canopy Made False Records.</u>

Bachert also sufficiently alleges "when" Triple Canopy failed to provide the armory services it purported to provide.  Bachert alleges when Triple Canopy and the State Department entered the Base Contract and then when the parties agreed to the latest Revision and Amendment to Task Order 5.  Bachert alleges Triple Canopy did not provide the services between July 2014 and May 2015 and that he informed supervisors above Fields beginning in December 2014 of the non-compliance.

Bachert also alleged when Triple Canopy made and used false records.  Bachert alleged that Fields falsified the inspection database on July 19, 2014 regarding rifle inspections and in December 2014 regarding Glock 30 inspections.  Bachert alleges Triple Canopy used the false records in response to a PMR review in December 2014.  Bachert also alleges Triple Canopy created and used false round count records in April 2015 in response to an inquiry from the State Department.  Bachert's allegations of when the conduct occurred that made Triple Canopy's claims false is sufficient under Rule 9(b).  *Smith v. Clark/Smoot/Russell, A JV*, 796 F.3d 424, 432-433 (4th Cir. 2015) (finding the relator satisfied Rule 9(b) by alleging when the work for

---

[1] With respect to Triple Canopy's argument that "generally," allegations on information and belief cannot meet Rule 9(b), the circumstances of this case are the exception to that rule because the facts about the submission of invoices are "peculiarly within the opposing party's knowledge," and relator has set forth the facts upon which his belief is based.  *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009).

The Court may infer that Bachert was unable, despite his reasonable and lawful efforts, to obtain the invoice information.  However, should the Court determine that he is required to also plead his efforts to obtain the information and inability to do so, Bachert requests leave to file a Second Amended Complaint with those allegations.

which the government was improperly billed was performed and when the contracts to perform that work were awarded).  Rule 9(b) does not require relators to identify when the invoices were submitted.

> D. <u>The Amended Complaint Alleges "Where" Triple Canopy Failed to Comply with the Requirements of Its Contract with the State Department.</u>

Bachert's allegations of where the conduct occurred that made Triple Canopy's claims false—the U.S. Embassy in Baghdad—is also sufficient under Rule 9(b).  *Smith*, 796 F.3d at 432-433 (4th Cir. 2015) (finding the relator satisfied Rule 9(b) by alleging where the work for which the government was improperly billed was performed).

## IV.   The Amended Complaint States a Claim that Triple Canopy Retaliated   Against Bachert in Violation of the FCA

In addition to prohibiting the presentment of false claims and creation and use of false records, the FCA also forbids retaliation against an individual "because of lawful acts . . . done in furtherance of an [FCA] action" or, since a 2009 amendment to the FCA, because of lawful acts "to stop 1 or more [FCA] violations." 31 U.S.C. § 3730(h). A plaintiff pleads an anti-retaliation suit under the FCA when he plausibly alleges (1) he engaged in protected activity; (2) his employer knew about these acts; and (3) the employer discriminated against him as a result of these acts. *Young v. CHS Middle East, LLC*, 611 Fed. App'x 130, 132 (4th Cir. 2015).   FCA retaliation claims are not subject to Rule 9(b)'s particularity requirements, subject instead to Rule 8(a)'s notice pleading standard. *Id.* at 134.

> A. <u>Bachert Engaged in FCA-Protected Activity</u>

Bachert engaged in FCA-protected activity by taking lawful acts to stop Triple Canopy's FCA violations.  Efforts to stop one or more FCA violations "motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA," are

protected activities. *Brach v. Conflict Kinetics Corp.*, No. 1:16-cv-978, 2017 U.S. Dist. LEXIS

121234, at *30 (E.D. Va. July 31, 2017) (citing *Carlson v. DynCorp Int'l LLC* 657 F. App'x 168,

172 (4th Cir. 2016).

> "A protected activity need not indicate that an actual FCA suit was being contemplated, but it must evince some attempt to expose possible fraud. 'An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation.' *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir. 1999). For activity to rise above the level of ordinary critique and constitute a step in preparation for an FCA claim, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover."

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d

724, 735 (4th Cir. 2010).

Bachert repeatedly warned supervisors that Triple Canopy was not performing its

obligations under Task Order 5, that Triple Canopy had used false records in reviews by the

State Department, and warned that the company could be subject to civil liability.  These acts

were more than internal suggestions or complaints.  Rather, Bachert's complaints implicated

potential impropriety and false claims and thus constitute FCA-protected activity.  *See, e.g.,*

*Owens*, 612 F.3d at 735.

When his internal efforts failed, Bachert informed a government-employed supervisor of

Triple Canopy's failure to comply with the core requirements of its contract to provide armory

services.  Rather than responding to his complaints or investigating the fabricated records, Triple

Canopy ignored Bachert.  When he reported Triple Canopy's knowing non-compliance with

Task Order 5 to a State Department employee, Triple Canopy supervisors began retaliating

against him, eventually removing him from guaranteed work.  This reinforces the reasonableness

of Bachert's belief that Triple Canopy was engaging in false claims because Triple Canopy took

no steps to correct its failure to maintain weapons or correct its fabricated records despite their

critical importance to the safety of personnel at the Embassy.  *Cf. Brach v. Conflict Kinetics Corp.*, No. 1:16-cv-978, 2017 U.S. Dist. LEXIS 121234, at *33 (E.D. Va. July 31, 2017) (finding that an employee could not have reasonably believed his employer was violating the FCA when it tasked him with uncovering billing errors and creating new procedures to avoid future errors).

B.  Triple Canopy was on Notice of Bachert's Protected Activity.

The Amended Complaint also meets the second element of an FCA-retaliation claim, as Bachert sufficiently alleges that Triple Canopy was on notice of his efforts to stop Triple Canopy's false claims.  "Such notice can be accomplished by expressly stating an intention to bring a qui tam suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." *Eberhardt v. Integrated Design & Const., Inc.,* 167 F.3d 861, 868 (4th Cir. 1999). To provide notice, a plaintiff is not required spell out the legal theory of an FCA violation but merely provide the facts that support a potential FCA action. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015) (holding that a plaintiff's complaint to the Department of Labor alleging Davis-Bacon Act payment violations sufficient to constitute FCA notice when the same facts supported a potential FCA claim).

An individual's complaints about regulatory non-compliance, breach of contract, or business decisions can constitute protected activity when the complaints involve *facts* that involve the possibility of FCA litigation.  *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010).[2]  A plaintiff need not use the words "fraud" or "False Claims Act" to engage in

---

[2]  The plaintiffs in *Young v. CHS Middle East, LLC*, for instance, engaged in FCA-protected activity when they complained the defendant employer was defrauding the government by making a business decision to breach its contract with the government to provide staff without the contracted-for level of expertise.  F. App'x 130, 133 (4th Cir. 2015).  In *Fitzsimmons v. Cardiology Associates of Fredericksburg, Ltd.*, the plaintiff engaged in FCA-protected activity

protected activity. *See, e.g., U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237-40 (D.C. Cir. 2012) (holding an employee "can be engaging in protected activity—although the employee is not contemplating bringing a *qui tam* suit, is not even aware that there is such a thing as a *qui tam* action, and has no idea whether his—the employee's—investigation or other acts, if made known to the government, might cause the Attorney General to sue his employer under the False Claims Act."); *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (holding "formal words of 'illegality' or 'fraud'" are not required to engage in FCA-protected activity) *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) (holding a plaintiff engaged in FCA-protected activity despite admitting she was unaware of the existence of the FCA).

The Fourth Circuit recently affirmed that a plaintiff could engage in FCA-protected activity without using the word fraud or invoking the FCA in *Smith v. Clark/Smoot/Russell*. 796 F.3d 424, 434 (4th Cir. 2015). In *Smith*, the plaintiff alleged his employer had notice of a claim that he was not being paid according to the Davis-Bacon pay scale through an oral complaint to the Department of Labor. *Id.* While the plaintiff eventually brought a FCA *qui tam* action *after* his employer's alleged retaliation, the plaintiff did not allege he threatened his employer with a FCA action or mentioned fraud through his complaint to the Department of Labor. *Id.* at 428-29, 434. However, the Fourth Circuit held that his complaint to the Department of Labor was FCA-protected activity of which his employer had notice because "the facts salient to that investigation make up the bulk of the facts supporting Smith's False Claims Act qui tam claims." *Id.* at 434. This decision accords with the weight of authority from other jurisdictions holding that a plaintiff need not mention the FCA, fraud, or even know the FCA exists to engage in FCA-

when he alleged fraudulent violations of federal regulations related to Medicare billing. No.

protected activity. *See, e.g., U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237-40 (D.C. Cir. 2012).

Here, Triple Canopy was on notice of Bachert's protected activity because he expressly mentioned Triple Canopy's non-compliance with Task Order 5, Triple Canopy's creation and use of fabricated records, and the potential civil liability associated with Triple Canopy's actions.

C.  Triple Canopy Retaliated Against Bachert Because of His Protected Activity.

The third element of a FCA retaliation claim is that the defendant retaliated against the employee because they engaged in protected activity. *Young*, 611 Fed. App'x at 132. Causation may be shown through temporal proximity between the employee's protected activity and the employer's adverse action. *Coursey v. Univ. of Md. E. Shore*, 577 Fed. App'x 167, 175 (4th Cir. 2014) (internal citations omitted) (quoting *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994), and *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 1994)). Here, Triple Canopy sent Bachert home on "Investigatory Leave," less than two months after he informed the program manager of Triple Canopy's violations of Task Order 5 and approximately a month after he contacted a State Department employee with his concerns. Based on temporal proximity alone, this is sufficient to plead causation. *King v. Rumsfeld*, 328 F.3d at 151, (4th Cir. 2003) (finding that temporal proximity of two and a half months is sufficient to establish a prima facie case of causation on temporal proximity alone).

Further, Triple Canopy sent Bachert home on "Investigatory Leave," presumably to investigate his claims regarding its violation of Task Order 5, as Triple Canopy never claimed Bachert engaged in actions that required investigation. This is direct evidence that Triple Canopy sent Bachert home because of his complaints. Then, the program manager to whom

3:15CV72, 2015 WL 4937461, at *2 (E.D. Va. Aug. 18, 2015).

Bachert complained removed Bachert from guaranteed work effective in thirty-days, again, without explanation.  These allegations indicate that any justification Triple Canopy may offer for its adverse actions toward Bachert is pretext.

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that this Court deny Defendant's Motion to Dismiss, or in the alternative, deny dismissal with prejudice.

Respectfully submitted,

STEPHEN BACHERT

By:      /s/ _____
Jack Jarrett (VSB #86176)
Alan Lescht and Associates, P.C,
1050 17th St., N.W., Ste. 400
Washington, D.C. 20036
(202) 463-6036 (phone)
(202) 463-6067 (fax)
jack.jarrett@leschtlaw.com
*Counsel for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 10, 2017, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send a notification of such filing to each counsel of record in this matter.

/s/ _____
Jack Jarrett (VSB #86176)
*Counsel for Plaintiff*