**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** ) | |
| **ex rel. STEPHEN BACHERT** ) | |
|     **Plaintiff,** ) | |
| ) | **Case No. 1:16-cv-456** |
| **v.** ) | |
| ) | |
| **TRIPLE CANOPY, INC.,** ) | |
|     **Defendant.** ) | |

**ORDER**

In this False Claims Act ("FCA")[1] and state law wrongful discharge action, the relator, Stephen Bachert, brought suit on behalf of the United States against Triple Canopy, Inc ("defendant"). Specifically, Bachert alleges that defendant submitted false claims to the U.S. State Department related to a contract to provide security services at the U.S. Embassy in Baghdad, Iraq. Bachert further alleges that defendant retaliated against him by transferring him, assigning him to a lesser paying job, and constructively discharging him, in violation of both the FCA's anti-retaliation provision[2] and the public policy of Virginia. Defendant now seeks summary judgment on each of Bachert's claims.

The matter has been fully briefed and argued and is now ripe for disposition.

**I.**

Of course, entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, it is important to identify the record facts as to which no genuine dispute exists. In this regard, Local

---

[1] 31 U.S.C. § 3729, *et seq*.

[2] 31 U.S.C. § 3730(h).

1

Rule 56(B) and the Rule 16(b) Scheduling Order issued in this case direct a movant for summary judgment to include in his submission a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists; the nonmovant must then respond to each paragraph citing admissible record evidence to establish a genuine dispute of material fact. *See United States ex rel. Bachert v. Triple Canopy, Inc.*, No. 1:16-cv-456 (E.D. Va. Nov. 8, 2017) (Order). Defendant complied with Local Rule 56(B) and the Scheduling Order. Bachert, however, did not comply, instead submitting his own list of undisputed facts. Accordingly, the following statement of undisputed material facts is based on defendant's statement of undisputed facts. Bachert's separate statement of undisputed facts and the record has also been scoured for facts that might be viewed as in conflict with the facts stated here.

- Relator, Stephen Bachert, is a Pennsylvania resident and former Triple Canopy employee.

- Defendant, Triple Canopy, Inc., is a government contractor that provides security services for government agencies.

- At all times relevant to this case, defendant had an indefinite delivery/quantity worldwide protective services contract (the Base Contract) with the State Department that governed defendant's provision of security services to the State Department worldwide.

- The State Department issued task orders pursuant to the Base Contract. Task Order 5, which relates to security services for the State Department at the United States Embassy in Baghdad, covered, among other things, provision of armory services by defendant.

- Defendant billed the State Department for armorers as part of a labor invoice to which a muster sheet was attached. The muster sheet reflected that particular personnel worked on particular days. Armorer services were billed by work day, not by task.

- Over the time period relevant to this case, the State Department renewed the Base Contract and Task Order 5 at least seven times.

- As part of providing armorer services at the Baghdad embassy, defendant inspected and maintained over 1700 weapons. Individuals classified as Armorers or Senior Armorers provided armory services. At various times relevant to this case, Bachert, Mark Fields (Fields), and others worked as armorers on a rotating basis.

- On March 26, 2015, Bachert provided a letter to defendant's Task Order 5 project manager detailing several complaints about Fields' armorer work, including the failure to inspect weapons and the failure to record inspections.

- On April 3, 2015, approximately a week after Bachert sent this letter to the Task Order 5 project manager, that project manager emailed another member of defendant's management seeking guidance on how to deal with Bachert's complaint. In that email, Frank Lauria, the project manager for Task Order 5, said of Bachert: "Much as I find him loathsome and would like to cut him off at the knees, at this point it would look retaliatory in nature and he'd cry to OIG and/or HR."

- Following Bachert's letter, defendant investigated Bachert's complaints by appointing an investigator outside Bachert's and Fields' chain of command. The investigator reviewed documents and conducted interviews. The investigator ultimately determined that the weapons inspection records alleged to be false were in fact true and accurate.

- In May 2015, the State Department also investigated Bachert's complaints.

- As a result of the State Department's investigation, the State Department issued a deficiency letter requiring defendant to institute a corrective action plan related to armorer services. The State Department did not withhold payment or seek any repayment in connection with Bachert's allegations. As to some of Bachert's complaints, however, the State Department determined the complaints could not be substantiated.

- Bachert admits that the State Department was aware of his allegations and that the State Department had access to the databases that Bachert believed were falsified.

- On May 20, defendant's managers exchanged emails about the armorer situation at the Baghdad embassy. One member of management suggested two plans: (i) move Fields to Basra, and (ii) send either Fields or Bachert home on vacation until another armorer position opened up. Another manager responded that these plans would not work because it would leave defendant shorthanded on Senior Armorers.

- After the State Department investigation concluded, an Alternate Contracting Officer's Representative from the State Department identified a personality conflict between Bachert and Fields and informally recommended that they both be removed from Task Order 5. The Alternate Contracting Officer's Representative did not issue a Loss of Confidence (LOC) letter to Fields or Bachert because the Representative found that neither had violated State Department rules or the contract. Defendant discussed both men on a telephone call with the State Department's High Threat Protection Division. Defendant began to take action to remove both men from Task Order 5.

- On May 26, in an email discussing the armorer situation, Lauria recommended that Fields be sent to Basra, Iraq and Bachert to Erbil, Iraq. The email did not give a reason for either of these assignments. According to Lauria, Bachert had been "on a crusade to have Mr. Fields removed and Bachert seen as the savior of the armory."

- When Bachert and Fields were removed from Task Order 5, there was only one permanent armorer position on another task order in Basra, Iraq. Fields was given the armorer position. Defendant claims that this decision was made based on Fields' seniority, but no contemporary emails or communications cite seniority as the reason for assigning Fields to the armorer position and defendant has no official policy regarding seniority and reassignment.

- On May 30, rather than reassign Bachert to another armorer position, defendant sent Bachert to the United States.

- Defendant offered Bachert a position as a temporary armorer in Irbil, Iraq, as well as a position on a separate contract. These positions both paid less than Bachert's previous armorer position. Bachert declined both positions.

- After declining these positions, Bachert requested that defendant release his security clearance so that he could pursue other job opportunities.

- Defendant told Bachert that it could not release Bachert's security clearance unless Bachert resigned.

- Bachert resigned and began new employment shortly thereafter in June 2015.

## II.

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented a false or fraudulent claim for payment," or "knowingly mak[ing], or caus[ing] to be made or used a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). The Fourth Circuit has held that a relator attempting to demonstrate that a defendant is liable under the FCA must show:

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*United States ex rel. Harrison v. Westinghouse Savannah River Co. (Harrison II)*, 352 F.3d 908, 913 (4th Cir. 2003). Where, as here, a relator proceeds on an implied false certification theory, the Supreme Court requires that "at least. . . two conditions [must be] satisfied: first, [a] claim does not merely request payment, but also makes specific representations about the goods or

4

services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truth." *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

Further, the Fourth Circuit has held "that in the context of the civil [FCA] the determination of materiality, although partaking of the character of a mixed question of fact and law, is one for the court." *United States ex rel. Berge v. Bd. of Tr. of the Univ. of Alabama*, 104 F.3d 1453, 1460 (4th Cir. 1997). Importantly, the Supreme Court reaffirmed this principle in *Escobar*, rejecting the "assertion that materiality is too fact intensive for courts to dismiss [FCA] cases . . . at summary judgment." *Escobar*, 136 S. Ct. at 2004 n. 6. The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court in *Escobar* also made clear that "[t]he materiality standard is demanding" and that a statutory, regulatory, or contractual requirement is "material" only if it affects "the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002. Accordingly, Justice Thomas, writing for the unanimous Supreme Court, explained that

> [a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* According to the Supreme Court, "[w]hether a provision is labeled a condition of payment is relevant, but not dispositive of the materiality inquiry" and proof of materiality can include evidence of the defendant's knowledge that "the government consistently refuses to pay claims

in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 2001, 2003.

Here, Bachert's claim fails because the undisputed record evidence in this case demonstrates that defendant's alleged false certification was not material to the government's decision to pay defendant under the Base Contract. To begin with, the alleged falsehoods at issue in this case – the alleged failure to inspect a handful of weapons and falsification of the accompanying inspection records – are the kind of "minor or insubstantial" noncompliance that *Escobar* advises are not material. Defendant's Base Contract governed substantial services defendant provided to the State Department globally, and the State Department issued numerous task orders related to the Base Contract. Fields' inspection records, the reports of a single armorer at a single base, are insubstantial in relation to the overall size of the Base Contract, and therefore it strains credulity to believe that those inspection reports were a factor in the government's decision to make payment on the contract. At best, Bachert has identified a limited number of instances where Fields failed to inspect weapons or catalog inspections out of a total of 1,700 weapons for which defendant's employees were responsible. Connolly Decl. at 37-38. Even if every weapons inspection by Fields was improper, review of defendant's labor invoices demonstrates that Fields' services accounted for only three-tenths of one percent of the total labor invoice to the government under the Base Contract. That invoice does not include other expenses billed to the government. No reasonable factfinder could conclude that these types of minor missteps in a small number of inspections, even assuming they occurred, would have impacted the government's decision to pay defendant under the Base Contract. *See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Co.*, 612 F.3d 724, 729 (4th Cir. 2010) (finding no materiality where billing for substandard concrete work was a small portion of a

$600 million project, noting that "[i]t would be remarkable if, on a project of this . . . scale, there were not some issues that quality control personnel would want to bring to supervisors' attention.").[3]

The record evidence in this case also makes clear that the State Department considered the allegations regarding Fields to be immaterial. *Escobar* teaches that this is an important factor in the assessment of materiality. There, the Supreme Court reasoned that where "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." 136 S. Ct. at 2003. Significantly, since *Escobar*, circuit courts have uniformly recognized that "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017).[4] Precisely this occurred here, as it is undisputed:

> (i) that the State Department had continuous access to weapons inspection records in real time,

---

[3] *See also Berge*, 104 F.3d at 1462 (holding that "no reasonable jury could possibly conclude that a multi-million dollar grant, continually renewed over a period of more than a decade," administered "by three internationally-respected scientists . . . would be reduced or eliminated due to UAB's lack of expertise in an area that could only be bolstered by the work of an unknown graduate student").

[4] *See also D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (dismissing a claim on materiality and causation grounds at the 12(b)(6) stage where the government agency continued to approve a device despite alleged fraud); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (affirming dismissal of an FCA claim where "the subsidizing agency and other federal agencies in this case 'have already examined [the for-profit higher education enterprise] multiple times over and concluded that neither administrative penalties nor termination was warranted.' "); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) (affirming summary judgment on an FCA claim, concluding that "[g]iven the demanding standard required for materiality under the FCA, the government's acceptance of Serco's reports despite their non-compliance with [the relevant guidelines], and the government's payment of Serco's public vouchers for its work . . . we conclude that no reasonable jury could return a verdict for Kelly on his implied false certification claim."); *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (affirming summary judgment on materiality grounds because "[W]e have the benefit of hindsight and should not ignore what actually occurred: the DCAA investigated [the relator's] allegations and did not disallow any charged costs. . . . This is "very strong evidence" that the requirements allegedly violated by the maintenance of inflated headcounts are not material."); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (holding that alleged fraud was not material to a payment decision because the government continued to approve a drug despite alleged labeling fraud).

(ii) that the State Department could review inspection data for accuracy at any time,

(iii) that the State Department did, in fact, review and approve labor invoices, including for armorer services, before defendant submitted the labor invoices for payment, and

(iv) that the State Department investigated Bachert's allegations regarding Fields' activities raised in his SAC, and concluded that they were not substantiated.

It is also undisputed that the State Department never asked for any money back from defendant upon learning of Bachert's allegations. Instead, the State Department repeatedly renewed defendant's Base Contract and TO-5 every time it had the option to do so, even after it learned of Bachert's allegations. This evidence is undisputed and insurmountable; no reasonable jury could conclude that the alleged falsehoods related to Fields' inspections were material to the government's decision to pay defendant. Accordingly, defendant's motion for summary judgment on count I must be granted.

### III.

Count II of the SAC alleges that defendant retaliated against Bachert for making complaints about Fields and the armory, in violation of the FCA's anti-retaliation provisions. 31 U.S.C. § 3730(h). Under § 3730(h), an employee may bring a retaliation claim against an employer who retaliates against the employee for the employee's "lawful acts . . . in furtherance of [a qui tam] action under this section or other efforts to stop 1 or more violations of [the FCA]." *Id.* A claim for retaliation requires a plaintiff to establish three elements: (i) that the plaintiff engaged in a protected activity, (ii) that the employer knew about the plaintiff's protected activity, and (iii) that the employer took adverse action against plaintiff as a result of the protected activity. *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir.2013). Importantly, a plaintiff need not prove an underlying FCA violation because, as the Supreme Court has explained, § 3730(h) protects an employee's conduct "even if the target of an investigation or

action to be filed was innocent." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel Wilson*, 545 U.S. 409, 416 (2005).

Defendant does not contest that Bachert engaged in protected activity and that defendant knew of Bachert's protected activities. Nor does defendant dispute that Bachert's removal from Task Order 5 and the subsequent failure to place Bachert in a new position was an adverse employment action. Instead, defendant's primary contentions are (i) that Bachert cannot allege that he was constructively discharged, and (ii) that defendant had a legitimate non-discriminatory reason for failing to place Bachert in a new position, namely that Bachert was the junior armorer and the only available armorer vacancy needed to be given to Fields on account of Fields' seniority.

With respect to Bachert's constructive discharge claim, a reasonable jury could conclude that Bachert was constructively discharged. The Fourth Circuit has held that "[a]n employee is entitled to relief absent a formal discharge, 'if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.'" *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995)). To prove constructive discharge, Bachert must show (i) deliberateness of the employer's action, and (ii) intolerability of the working conditions." *Whitten v. Fred's Inc.*, 601 F.3d 231, 248 (4th Cir. 2010). Importantly, "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citing *Jurgens v. EEOC*, 903 F.2d 386, 391-92 (5th Cir. 1990)). Bachert has presented evidence that he was removed from paid work as a senior armorer and was then offered only positions that would have amounted to demotions with reduced pay. The Fourth Circuit has recognized that

9

demotions of this type may constitute constructive discharge. *See id.* Bachert also presents evidence that this action was motivated by discriminatory animus, thus allowing a jury to conclude that defendant acted intentionally to subject Bachert to intolerable working conditions. *See infra.* Defendant argues that defendant offered Bachert these positions to help him because no other armorer positions were available, but a reasonable jury could conclude, based on Bachert's account and the record evidence, that defendant constructively discharged Bachert by subjecting him to demotions. Accordingly, summary judgment on the constructive discharge portion of Bachert's FCA claim is inappropriate at this stage.

Given that defendant has proffered a legitimate non-discriminatory reason, the burden shifts back to Bachert to establish that there is a genuine dispute of material fact as to whether defendant's stated reason was pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[5] Bachert meets this burden. To begin with, there is direct evidence in the record that the decisionmakers may have had retaliatory animus against Bachert, which may have motivated their decisonmaking. Specifically, in emails discussing Bachert's complaints, one of defendant's program managers emailed other members of the management team about Bachert, and stated that he found Bachert "loathsome" and that he wanted to "cut him off at the knees[,]" but that he worried that terminating Bachert might "look retaliatory in nature and he'd cry to OIG and/or HR." Apr. 3, 2015 Email from Lauria to Johnson at SBTC-5597-98. In another

---

[5] Although the Fourth Circuit has not explicitly held that the McDonnell Douglas burden-shifting framework applies in FCA retaliation cases, there is little doubt that the framework applies there as the Fourth Circuit has applied the framework in similar contexts, including retaliation claims under Title VII. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Moreover, other circuits and district courts in this circuit have routinely applied the framework to FCA retaliation claims. *See, e.g., Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 n.3 (5th Cir. 2016) ("We . . . apply the McDonnell Douglas framework to the False Claims Act's anti-retaliation provision."); *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("We hold . . . that the FCA's anti-retaliation provision is amendable to the use of the McDonnell Douglas framework."); *see also, e.g., Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 751 (E.D. Va. 2017) ("Here, because there is no direct evidence of retaliatory intent, the familiar McDonnell Douglas burden-shifting framework applies to the summary judgment motion."); *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 620-21, n.15 (E.D. Va. 2016) ("[A] retaliation claim under . . . the FCA is subject to the McDonnell Douglas burden-shifting analysis[.]").

email, Lauria stated that he believed Bachert "was on a crusade to have Mr. Fields removed and Bachert seen as the savior of the armory[.]" May 29, 2015 email by F. Lauria, at SBTC-23406-23407. Defendant does not address this evidence in its brief, simply reiterating instead that defendant's decision was reasonable. Further, defendant argued in the summary judgment hearing that the context shows that these statements were not retaliatory, but deciding what these statements meant and to whom or what they referred is precisely the kind of determination best left to a jury.

In addition to this direct evidence of retaliatory animus, Bachert has also demonstrated that defendant has no written policy regarding seniority preference for any positions, and there was no recorded discussion among the decisionmakers about seniority preferences when the decision was made to place Fields instead of Bachert in the only open armorer position. The lack of contemporary documentation, together with the lack of a formal seniority policy and the contemporaneous statements of defendant's decisionmakers showing animus towards Bachert based on his protected activity, presents a jury issue, namely whether the proffered seniority justification for failure to place Bachert in a new armorer role was the real reason Bachert was not placed in a new armorer position or whether it was a *post hoc* justification asserted by defendant for the first time only in this litigation. *See E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846 (4th Cir. 2001) (a factfinder could infer from the fact that an employer's reasons for termination or failure to hire are articulated only long after the termination suggest pretext).[6] Accordingly, there is a genuine dispute of material fact as to whether defendant's adverse action was motivated by seniority preference or by retaliatory animus, and as such defendant's motion for summary judgment on Bachert's retaliation claim must be denied.

---

[6] *See also Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir.2000) ("We are disquieted . . . by an employer who 'fully' articulates its reasons for the first time months after the decision was made.").

12

## IV.

Bachert concedes that his Virginia wrongful termination claim in count III fails because Virginia courts have not recognized constructive discharge claims.[7] As such, defendant's motion for summary judgment on Bachert's Virginia constructive discharge claim must be granted.

Accordingly, for the reasons stated above, and for good cause shown,

It is hereby **ORDERED** that defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** (Doc. 66). It is **GRANTED** with respect to count I (FCA) and count III (state constructive discharge and **DENIED** with respect to count II (FCA retaliation).

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia  
June 8, 2018

/s/  
T. S. Ellis, III  
United States District Judge

---

[7] *See Stradtman v. Republic Servs., Inc.*, 121 F. Supp. 3d 578, 583 (E.D. Va. 2015) ("The Fourth Circuit has declined to recognize a constructive discharge exception to the employment-at-will doctrine, concerned that federal courts would extend state law beyond any point recognized by Virginia law.").